THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| NESHA MITCHELL, | ) | Case No.  8:23-cv-549 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **COMPLAINT AND JURY TRIAL** |
| | ) | **DEMAND** |
| | ) | |
| SIGNATURE PERFORMANCE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

COMES NOW the Plaintiff, Nesha Mitchell, by and through her attorneys, and for her cause of action against the Defendant, Signature Performance, Inc., hereby states the following:

## INTRODUCTION

1.      This is an action under the Family Medical Leave Act challenging Defendant's interference and retaliation with respect to Plaintiff's rights to FMLA-protected leave, under the ADA Amendments Act of 2008, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the Nebraska Fair Employment Practices Act challenging Defendant's discrimination and retaliation against Plaintiff.

2.      Plaintiff, Nesha Mitchell, is an African American woman. While she worked for the Respondent, she was a resident of Arizona.  She is currently a resident of Omaha, Nebraska.

3.      At all relevant times, Defendant Signature Performance Inc. ("Signature"), has been a Nebraska corporation, with its corporate headquarters in Omaha, Nebraska. Defendant does business at its location at 10250 Regency Circle, Suite 500 in Omaha, Douglas County, Nebraska.

4.      The acts about which Plaintiff complains occurred in Douglas County, Nebraska.

1

## PROCEDURAL REQUIREMENTS

5.      The Plaintiff filed a charge with the Nebraska Equal Opportunity Commission with respect to Plaintiff's complaint on or about September 1, 2022.

6.      Plaintiff has yet to receive her right to sue from the EEOC but it is expected to be received prior to the trial of this matter, and Plaintiff shall amend her complaint accordingly upon receipt.

7.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331.

8.      The employment practices alleged to be unlawful were committed by individuals working for Defendant whose principal place of business is located in Omaha, Douglas County Nebraska therefore the appropriate venue is the United States District Court for the District of Nebraska pursuant to 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

9.      Signature employs more than fifty (50) employees within a seventy-five-mile radius of the office in Omaha to which Nesha reported and from which she received her work assignments.

10.     Nesha worked more than 1250 hours annually in 2020 and the year preceding her requests for FMLA leave.

11.     Defendant hired Nesha on or about April of 2018.

12.     Nesha received notice of her termination on December 20, 2021.

13.     As an employee who worked remotely, Nesha was covered under the FMLA because the office to which Nesha reported and from which assignments were made employed 50 or more employees working within 75 miles of its location. See 29 C.F.R. § 825.111(2).

14.     For many years, Nesha worked in various positions for Defendant and her performance was always satisfactory.

15.     Signature provides healthcare services and staffing to various healthcare clients, one of which was Optum, Inc., a healthcare services provider with business interests encompassing technology and related services, pharmacy care services and various direct healthcare services (hereinafter "Optum")

16.     As one of her assignments for Signature, Plaintiff began training as a scheduling representative on or about November 15, 2021, with Optum.

17.     Nesha's immediate supervisor while training for the Optum position was Kenn Whipple, and the training personnel from Optum included both Audrey Gilbert and Amber Groneck.

18.     Shortly after beginning her training, Ms. Gilbert complained to Nesha that she could allegedly not be seen on camera because she was "showing up too dark."

19.     Nesha asked her co-workers who were also present at the online training session whether they could see her, and they told her they could.

20.     On November 18, 2021, Ms. Gilbert emailed Nesha and thanked her for adjusting her camera, indicating the issue had been resolved.

21.     Ms. Gilbert made similar comments about not being able to see Nesha at various times throughout this training even though Nesha made adjustments to her camera and desk position.

22.     Ms. Gilbert overly scrutinized Nesha's actions and words during training sessions.

23.     In early December 2021, Nesha advised Ms. Whipple that she believed that Ms. Gilbert was making comments about her showing up  too dark because of her race/the color of

3

her skin.  Whipple told Nesha that she would call her back.  Ms. Whipple then called Nesha back and said, "Nesha, never say that again."

24.      On December 3, 2021, Nesha and her team were continuing to train with Gilbert, but several of them were confused on the required tasks.  Ms. Gilbert was present on the training call.  Nesha said, "The trainer is in here.  Maybe she can help us."  Gilbert replied that she was not there to take questions.  She was just there to take notes.

25.      Nesha reported Ms. Gilbert's refusal to answer questions about the tasks to both Ms. Whipple and Mr. Hiatt.  Nesha told Ms. Whipple, "Kenn, she told me that she's not here to answer questions.  What is that about?"  Ms. Whipple told Nesha that what she was reporting was concerning and that Ms. Gilbert should be answering questions if the trainees had questions.

26.      On December 3, 2021, Curt Hiatt, Director of Operations at Signature, (hereinafter "Mr. Hiatt") sent an email  message to Nesha indicating that Ms. Gilbert was offended that Nesha had said, "The trainer is in here. Maybe she can help."  Ms. Gilbert and the Optum leadership team claimed that Nesha's "tone" was inappropriate.

27.      Nesha didn't make the comment on December 3, 2021, in an unprofessional "tone."  She merely stated the obvious that Ms. Gilbert, the Optum trainer, was present in the meeting and could possibly help.

28.      In response to Mr. Hiatt's instant message, on December 6, 2021, Nesha advised Mr. Hiatt that she believed that Ms. Gilbert had something personal against her, that her comment regarding Ms. Gilbert being present during the training was not unprofessional, and that Nesha was not comfortable continuing to work with her.  Mr. Hiatt responded and acknowledged that Ms. Gilbert had taken their interaction during the training session the "wrong way" and that Ms. Gilbert's conduct in not answering the questions was "very troubling".  Mr.

4

Hiatt also informed Nesha that he would bring up these concerns to the Optum's training team again.

29.     On December 7, 2021, Nesha emailed Ms. Whipple that she had concerns regarding the Optum trainers and Ms. Gilbert in particular.  Nesha indicated that this position was causing her to have headaches.  Nesha requested a transfer from the Optum position due to the inadequate training she was receiving from Optum and adverse treatment she was receiving from Ms. Gilbert.

30.     Later that day, Ms. Whipple responded in an email to Nesha indicating that they had informed the Head Optum Trainer and the Optum Vendor Liaison of Nesha's concerns. Optum indicated to Signature representatives that they were "open to our honest, respectful feedback and that Signature representatives were going to meet with the Optum representatives to go over it and possibly implement some changes."

31.     On December 10, 2021, Nesha notified Ms. Nolte and Ms. Whipple of the need for a sick day due to a headache.

32.     Other Signature employees were also requesting additional training and asserting they were going to quit because of the inadequate information that they were receiving from Optum.

33.     On December 13, 2013, training was ending.  Nesha had already taken her test for the training period on a different day.

34.     During this training session on December 13, 2013, Nesha asked if before she cut them loose, if she could go over the task.  Ms. Gilbert stated, "What do you mean, Nesha?" There were several other students in the training session that day.  Nesha said, "I don't

understand the task, and I think other people are struggling with the task, too. Right guys?" Her co-workers also indicated that yes, they were having problems with it, too.

35.     Shortly thereafter, Mr. Hiatt informed Nesha that Optum was upset with Nesha because she requested additional help with the task during the training session.

36.     On or about December 13, 2021, Defendant reprimanded Plaintiff with a final warning for "Performance – Unprofessional Behavior."

37.     The alleged bases for the final warning were the camera issues that had been resolved on November 18, 2021; the alleged negative attitude on December 3, 2021, the basis for which was false; and the alleged negative attitude on December 13, 2021, which was false.

38.     On December 13, 2021, Nesha met with Anthony Juza, Operations Manager for Signature, (hereinafter "Mr. Juza) and Ms. Whipple by remote video conference to discuss the final warning.

39.     During that conversation, Nesha indicated that what Optum representatives were reporting was not true.

40.     Optum reported that Nesha stated that Nesha was blaming Audrey specifically for being poorly trained and not being prepared to be live on the floor.

41.     Nesha never blamed Ms. Gilbert for Nesha being poorly trained, and she never said she was poorly trained.

42.     Nesha also asked Ms. Whipple and Mr. Juza whether they performed an investigation into what Optum reported regarding Nesha's alleged statements in the training.

43.     Signature did not perform an investigation regarding Optum's assertions regarding Nesha's alleged conduct during training on December 13, 2021.

6

44.     And in response to the final warning, Nesha wrote back to Signature the following, in part:

> **Nesha Mitchell gave the following reasons:**
> Audrey explained by IM that she was pleased with my camera which I have Proof of ( I can give you this) . Camera's were an issues for many employees so I do not want to feel as if I am being targeted. I expressed that I believed there may be a personal issue against however the ojts do not know me. They have only seen me, is the issue with the way I look? That would be concerning. All of these issues have been discussed with management. However it seems as those my issues havent been taken serio

45.     No one from Signature ever investigated Nesha's concerns regarding being targeted because of her skin color.

46.     Signature's employment handbook states:

> It is the responsibility of management and each supervisor to assure a continuation of this policy of equal employment opportunity for all persons on the basis of individual merit.

47.     No one from Signature ever addressed Nesha's complaints regarding disparate treatment related to her race/skin color, despite Nesha reporting them to multiple supervisors and the department manager.

48.     On December 13, 2021, at 7:46 p.m., Nesha sent an email to Mr. Hiatt indicating that she needed to take the next day off of work due to high levels of stress, anxiety, and headaches.  Nesha stated:

> Good Evening,
> Please accept this email as my written notification that I will be unable to attend work tomorrow due to high levels of stress, anxiety, and a migraine. I did receive my written final and it brought up issues that were concerning including statements addressing my camera from a month ago that were previously resolved. That struck me as odd because on November 18th at 3:36 Audrey wrote and stated thank you for fixing your camera. It's interesting because I have documentation of camera issues being addressed with a number of staff as recent as the December 11th (some employees being addressed on multiple occasions). Also Curt wrote me on the November 18th 2:17 thanking me for my compliance so it's shocking we are almost a month later and these camera concerns are being mentioned when they haven't been an issue at all. Kenn informed me signature

(without an investigation) that they are believing, I made the statement "it's Audrey's fault we don't know the task" that is false. Curt did state "this isn't the end all be all" however its (sic) clear my job is at risk and you guys are attempting to fire me based on false statements. Curt stated " Signature has to do something ", "Optum is a very big client that we are trying to work with" and the written final is what they have chosen to do even if it's based on false statement without an investigation.

49.     Nesha requested medical leave for December 14, 2021, due to her disability/serious health condition.

50.     Nesha had already been approved for PTO for her doctor's appointment for her anxiety.

51.     On or about December 14, 2021, Plaintiff saw her physician, Olu Onisile, M.D. who then filled out FMLA paperwork for her for intermittent leave due to her anxiety.

52.     On December 15, 2021, Plaintiff submitted FMLA paperwork to Defendant requesting intermittent FMLA leave due to her serious health condition.

53.     Later that day, Defendant texted Plaintiff claiming that he tried to call her cell phone for a wellness check.  Nesha responded to Mr. Hiatt's text message by saying, "Hi, Curt, I'm on PTO."  Mr. Hiatt did not respond.

54.     On December 16, 2021, Plaintiff again notified Signature that she would require time off due to her disability/serious health condition.

55.     No one from Signature ever responded to Nesha's requested FMLA leave.

56.     On December 20, 2021, Plaintiff was informed she had been discharged after attempting to login to her computer and finding her credentials were no longer valid.

57.     The reasons asserted by Signature for Nesha's discharge are untrue.

## SIGNATURE'S REPRESENTATIONS TO THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

58.     On October 7, 2022, Defendant submitted its position statement to the EEOC in response to Nesha's EEOC Charge of Discrimination.

59.     Pursuant to EEOC guidelines, the individual signing the position statement to the EEOC is authorized to speak on behalf of the Defendant.

60.     Signature represented to the EEOC that it was never aware of Nesha's disability.

61.     Nesha had previously informed her manager, Anthony Juza, of her anxiety.

62.     Nesha had previously informed other representatives of Signature during the month of December 2021 regarding her anxiety and migraines.

63.     Signature represented to the EEOC that Nesha didn't want anyone to see her or her headset.

64.     To the contrary, after being told that a headset and camera were required, Nesha wore her headset and was visible for training.

65.     Signature represented to the EEOC that Nesha did not respond to Ms. Goneck's notification on November 16, 2021.

66.     Nesha did respond to the concern raised by emailing Mr. Hiatt regarding the camera/headset issue.

67.     On November 18, 2021, Ms. Gilbert thanked Nesha for fixing her camera.

68.     Signature represented to the EEOC that Nesha didn't successfully complete the probationary evaluation period.

69.     Nesha was not subject to a probationary period during this placement with Optum.

70.     Signature's employment handbook states that an employee's probationary period is the first ninety (90) days of employment with Signature.  Nesha had been employed by Signature for many years in December of 2021.

71.     Optum had a test at the end of the training to showcase if you were ready for the phone. You also had to take a phone call to graduate.

72.     Nesha had taken a test and completed the phone call required to pass the requirements of the probationary period.  She was informed that she did well on both.

73.     Signature represented to the EEOC that Nesha failed to follow instructions and had poor attendance.

74.     Nesha resolved the issue with her camera on November 18, 2021.

75.     Nesha followed instructions.

76.     Nesha requested PTO that was approved by Signature and then canceled following her request for FMLA.

77.     Signature represented to the EEOC that Nesha missed a half day of work on December 3, 2021, and a full day on December 10, 2021, without excuse or explanation.

78.     Per Signature's policy, Nesha is not required to provide an excuse or explanation regarding PTO.

79.     Nesha requested PTO for both days, which was approved.

80.     Nesha only missed 2.52 hours on December 3, 2021, for a dentist appointment.

81.     Nesha emailed Nichole Nolte on December 10, 2021, at 7:43 a.m. informing her that she was not feeling well because of a headache.  Ms. Nolte responded at 8:11 a.m. and said, "I will notify Amber.  Thank, hope you feel better soon."

82.     Signature represented to the EEOC that Nesha's behavior was unprofessional.

83.     Nesha did not act unprofessionally regarding her interactions with Optum trainers.

84.     Optum's trainer falsely claimed that Nesha said that she was poorly trained and that it was Audrey's fault that she was poorly trained.

85.     Signature did not ever investigate whether Optum's trainers were saying these things to get Nesha into trouble and/or treating Nesha differently based on her race or her skin color.

86.     Signature did not speak with any other Signature employees at the training on December 13, 2021, to determine whether Nesha actually said that she was poorly trained or that it was Ms. Gilbert's fault that she was poorly trained.

87.     Signature represented to the EEOC that Mr. Hiatt told Nesha that she could come back to training if she put forth the effort.

88.     Mr. Hiatt never informed Nesha anything about not putting forth effort.

89.     Nesha was never banned from training.

90.     Mr. Hiatt's email to Nesha on December 14, 2021, stated:

Good morning Nesha,

There are specific details in your statement that link my name and what I said as quoted with added conjecture. You added: "and the written final is what they have chosen to do even if it's based on false statement without an investigation." that is simply far from the truth from what I was saying, that is what you were saying. I explained that yesterday three Optum staff members identified you as being unprofessional in the class, it wasn't just one. I explained that we need to be consistent with handling of these types of issues and be consistent with our administration of them. There had been previous communications/discussions regarding your statements to the Optum Training Staff and we need to administer a Final Written. I did say the Final Written Warning doesn't have to define you, and that others in our company have come back from final written warnings and not been a problem, as we don't judge people on a mistake, we want them to grow. We see Optum as a potential long-term partner and if you have concerns you need to express them to Signature Performance Management Team not to the Optum Trainers, which had previously been communicated by Josh, Kenn, and me in various forms of communication.

Again, this doesn't have to define you. I see that you are online so I am hopeful that you can go through your training over the next few days with a different group from Optum and see if the extra time helps.

91.    Signature represented to the EEOC that Nesha failed to report to work on December 15, 2021, without excuse.

92.    Nesha had previously requested PTO for December 15, 2021, which had been approved.

93.    Nesha also submitted FMLA paperwork on December 15, 2021.

94.    Nesha also responded to Mr. Hiatt's "wellness check" text on December 15, 2021, stating:



95.    Signature represented to the EEOC that Nesha didn't respond to Mr. Hiatt's communication on December 15, 2021.

96.    She did respond by text message as outlined in paragraph 94.

97.    Signature represented to the EEOC that they could not contact Nesha because they did not have her personal email address.

98.    Signature did have Nesha's personal email address in their records.

99.    Moreover, Nesha had already responded to Mr. Hiatt's text message on December 15, 2021.

100.    Signature's payroll system contained Nesha's personal cell phone and email address.

101.    Nesha also emailed Signature on December 16, 2021, indicating that she was still not feeling well and was requesting leave.

102.    Signature represented to the EEOC that Signature made the decision to terminate Nesha on December 15, 2021.

103.    Signature's termination letter is dated December 16, 2021, and Nesha was not notified of any termination until December 20, 2021.

104.    On December 20, 2021, Signature's HR Business Partner, Melissa Avidano, emailed Nesha and stated as follows:

Hello Nesha,

There were attempts to reach you with no response. Please see the attached letter. A certified copy is also being mailed to your home address. A member of our admin team will be in touch to coordinate the return of equipment including the RSA token.

Respectfully,
Melissa

**Melissa Avidano**
**HR Business Partner III**
Cell 402.769.8017   Direct 402.393.9788   Extension 1053   Fax 402.939.0663

105.    Again, in her email of December 20, 2021, Ms. Avidano falsely claimed that there were attempts to reach Nesha with no response.

106.    Signature represented to the EEOC that Nesha knew she was going to be terminated.

107.    Nesha did not know she was going to be terminated and was following company policy by submitting her PTO requests and FMLA paperwork to request time off due to her disability/serious health condition.

108.    Signature had a point system regarding absences as outlined in Signature's Associate Handbook.

13

109.    Nesha had plenty of PTO available to use for her absences in December of 2021.

110.    Nesha was not issued any "points" under the absence policy.

111.    Nesha did not accumulate sufficient "points" for termination under the absence policy.

112.    Nesha followed the FMLA policy in the handbook for requesting FMLA leave.

113.    Signature did not respond to Nesha's request for FMLA leave.

114.    Signature represented to the EEOC that there were no other positions available for which Nesha could transfer.

115.    To the contrary, on December 15, 2021, Signature advertised on Facebook that it was hiring associates.

116.    Signature's Associate Employment Handbook stated that Signature will not tolerate harassment of any Associate for any reason.

117.    Signature did not ever reach out to Nesha to engage in any sort of interactive process.

118.    Nesha's performance at Signature was always satisfactory.

## NESHA WAS THE VICTIM OF THE ANGRY BLACK WOMAN NEGATIVE RACIAL STEREOTYPE

119.    There is a common racial stereotype called the "angry Black woman stereotype" that has been the subject of many peer-reviewed studies.

120.    According to an experiment performed in a peer-reviewed study published in the Journal of Applied Psychology in 2022, participants that viewed videos of workers of different genders and races expressing anger at work were more likely to attribute the anger of Black female employees to internal characteristics or her personality.

https://psycnet.apa.org/doiLanding?doi=10.1037%2Fapl0000884

14

121.    The Harvard Business Review undertook their own review of the published

literature surrounding the Black Angry Woman stereotype and found, in summary:

> The angry Black woman stereotype exists in many parts of American culture —
> including the workplace. Studies show people in organizations believe Black women are
> more likely to have belligerent, contentious, and angry personalities, an assumption not
> as readily assigned to other men and women. Recent studies suggest this negative
> perception is a unique phenomenon for Black women, and the researchers suggest that
> when Black women outwardly express anger at work, her leadership and potential are
> called into question.

See https://hbr.org/2022/01/the-angry-black-woman-stereotype-at-work

122.    Representatives of Optum and Signature were influenced by racial stereotypes

when making decisions regarding Nesha's employment.

## COUNT I
## INTERFERENCE AND RETALIATION
## UNDER THE FAMILY MEDICAL LEAVE ACT

123.    Plaintiff repleads paragraph 1 to 122 as fully set forth herein.

124.    Defendant is and was at all times material an "employer" within the meaning of

the Family Medical Leave Act.

125.    Plaintiff is and was at all times material an "eligible employee" within the

meaning of the Family Medical Leave Act.

126.    Plaintiff suffered from one or more "serious health conditions" within the

meaning of the Family Medical Leave Act.

127.    Plaintiff was entitled to leave under the Family Medical Leave Act.

128.    Plaintiff invoked her right to leave under the Family Medical Leave Act.

129.    At all times throughout Plaintiff's illness, she kept the Defendant informed about

her serious health condition and her need for medical leave.

130.    Defendant interfered with Plaintiff's right to take leave under the Family Medical Leave Act.

131.    Defendant discriminated against Plaintiff and fired her for exercising her rights under the Family Medical Leave Act.

132.    As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including, but not limited to, lost wages, benefits, future earnings, and other emoluments of employment.

WHEREFORE, Plaintiff Nesha Mitchell demands judgment against Defendant in an amount which will fully compensate her for her injuries and damages, for liquidated damages, for prejudgment and post-judgment interest, for attorneys' fees, for the cost and expenses of this action, for equitable relief, and for such other relief as may be just in the circumstance consistent with the Family Medical Leave Act.

## COUNT II

### DISCRIMINATION AND RETALIATION IN
### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT AND
### NEBRASKA FAIR EMPLOYMENT PRACTICES ACT

133.    Plaintiff repleads paragraph 1 to 132 as fully set forth herein.

134.    Defendant is and was at all times material an "employer" within the meaning of the Americans with Disabilities Act ("ADA") and the Nebraska Fair Employment Practices Act ("NFEPA").

135.    Plaintiff's anxiety has substantially limited her brain function, musculoskeletal system, cardiovascular system and her ability to sleep, concentrate, interact with others and work.

136.    Plaintiff's migraine headaches have substantially limited her ability to sleep, concentrate, interact with others and work.

137.    Plaintiff was and is disabled within the meaning of the ADA and NFEPA.

138.    Plaintiff was able to perform the essential functions of her job with or without reasonable accommodation.

139.    Defendant discriminated against Plaintiff with respect to terms and conditions of her employment in violation of the ADA.

140.    Plaintiff's disabilities were a motivating factor in Defendant's decision-making regarding Plaintiff's employment culminating in her termination.

141.    Plaintiff requested reasonable accommodations for her disabilities.

142.    Defendant failed to engage in good faith in an interactive process with Plaintiff to determine how best to accommodate her disabilities.

143.    Defendant failed to accommodate Plaintiff's disability in violation of the ADA and FEPA.

144.    Plaintiff's request for reasonable accommodation was a motivating factor in Defendant's decision-making regarding Plaintiff's employment culminating in her termination.

145.    Defendant, personally or by its representatives' actions, willfully, maliciously, and intentionally, with reckless indifference to the rights of the Plaintiff, discriminated against Plaintiff in violation of the "Americans With Disabilities Act," 42 U.S.C. §12112, and by doing so are subject to punitive damages.

146.    As a result of the Defendant's acts and omission, Plaintiff has in the past and will in the future suffer injuries and damages, including, but not limited to mental and emotional

distress; humiliations; fear; embarrassment; lost enjoyment of life; lost wages; benefits and other emoluments of employment.

WHEREFORE, Plaintiff Nesha Mitchell demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for appropriate equitable relief, for punitive damages, for interest as allowed by law, for attorney's fees, for the costs and expenses of this action, and for such other relief as may be just in the circumstances and consistent with the ADA and NFEPA.

**COUNT III**
**RACE DISCRIMINATION AND RETALIATION**
**(TITLE VII OF THE CIVIL RIGHTS ACT AND**
**NEBRASKA FAIR EMPLOYMENT PRACTICES ACT)**

147.     Plaintiff repleads paragraphs 1 to 146 as fully set forth herein.

148.     Plaintiff was subject to offensive racial comments and disparate treatment due to her race and/or skin color.

149.     Plaintiff complained about race discrimination and discrimination based on the color of her skin.

150.     Defendant was aware of her complaints and did nothing to remedy the discriminatory environment.

151.     Defendant disciplined and then terminated Plaintiff.

152.     Plaintiff's race was a motivating factor in her disparate treatment, discipline, and termination.

153.     Plaintiff's protected activity was a but-for cause of her termination.

18

154.    Plaintiff has and continues to suffer emotional pain, suffering, inconvenience, mental anguish, depression, loss of enjoyment of life, and other non-pecuniary losses as a direct result of Defendant's discrimination.

155.    Plaintiff will suffer future pecuniary losses as a direct result of Defendant's discrimination and retaliation.

WHEREFORE, Plaintiff Nesha Mitchell, demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries, damages, prejudgment and post-judgment interest, for attorneys' fees, for the costs and expenses of this action, for equitable relief, and for such other relief as may be just in the circumstances and consistent with the purposes of Title VII and NFEPA.

## COUNT V
## RACE DISCRIMINATION AND RETALIATION
## (42 U.S.C. § 1981)

156.    Plaintiff repleads paragraphs 1 to 155 as fully set forth herein.

157.    Plaintiff was subject to offensive racial comments and disparate treatment due to her race and/or skin color.

158.    Plaintiff complained about race discrimination and discrimination based on the color of her skin.

159.    Defendant was aware of her complaints and did nothing to remedy the discriminatory environment.

160.    Defendant disciplined and then terminated Plaintiff.

161.    Plaintiff's race was a motivating factor in her disparate treatment, discipline, and termination.

162.   Plaintiff complained to Defendant that she was being treated differently because of her race or the color of her skin.

163.   Plaintiff's protected activity was a but-for cause of her termination.

164.   The unlawful practices described above were intentional.

165.   Plaintiff has and continues to suffer emotional pain, suffering, inconvenience, mental anguish, anxiety, depression, loss of enjoyment of life, and other non-pecuniary losses as a direct result of Defendant's discrimination.

166.   Plaintiff will continue to suffer pecuniary losses as a direct result of Defendant's discrimination.

167.   Defendant engaged in discrimination against Plaintiff with malice or reckless indifference to Plaintiff's rights under 42 U.S.C. § 1981.

WHEREFORE, Plaintiff Nesha Mitchell, demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries, damages, liquidated damages, for prejudgment and post-judgment interest, for attorneys' fees, for the costs and expenses of this action, for equitable relief, and for such other relief as may be just in the circumstances and consistent with the purpose of 42 U.S.C. § 1981.

## PRAYER FOR RELIEF

Wherefore, Plaintiff, Nesha Mitchell, respectfully requests that this Court:

A.   Grant a permanent injunction enjoining Defendant, its officers, successors, assigns, and all persons in active concert or participation with it, from engaging in any employment practice which discriminates on the basis of race, color, disability, and or retaliation.

B.      Order Defendant to pay Plaintiff back pay, front pay, compensatory damages, consequential damages, and liquidated damages, in amounts to be proven at trial, and all other affirmative and equitable relief necessary to eradicate the effects of Defendant's unlawful employment practices.

C.      Direct Defendant to expunge all negative reports in Plaintiff's personnel file.

D.      Order Defendant to pay Plaintiff punitive damages for its malicious and reckless conduct in an amount to be determined at trial.

E.      Award Plaintiff reasonable attorneys' fees, expenses, and expert witness fees.

F.      Award Plaintiff her costs in this action.

G.      Grant such relief as the Court deems necessary and proper.

## JURY DEMAND

COMES NOW the Plaintiff, through her attorneys, and hereby requests a trial by jury, in Omaha, Douglas County, Nebraska.

NESHA MITCHELL, Plaintiff

BY:    /s/Kelly K. Brandon
Kelly K. Brandon, #20734
Fiedler Law Firm, P.L.C.
17330 Wright Street
Suite 102
Omaha, NE 68130
(402) 316-3060
kelly@employmentlawnebraska.com
Attorneys for Plaintiff